IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHAWN J. PATTERSON, | : | |
| Plaintiff | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| JO ANNE B. BARNHART, | : | No. 04-CV-5071 |
| Commissioner of the | : | |
| Social Security Administration, | : | |
| Defendant | : | |

REPORT AND RECOMMENDATION

TIMOTHY R. RICE
U.S. MAGISTRATE JUDGE

Plaintiff Shawn Patterson seeks review of the decision of the Administrative Law Judge ("ALJ") finding him able to work despite impairments resulting from a gunshot wound he suffered in 1993. After determining that Patterson's right hip trauma, depression, and post-traumatic stress disorder ("PTSD") were severe impairments, the ALJ concluded that Patterson retained the functional capacity to perform low-stress, light work.

Patterson's action is brought pursuant to 42 U.S.C. § 405(g) and 1383(c)(3) seeking judicial review of the final decision of Commissioner Jo Anne Barnhart ("Commisioner"), who denied Patterson's application for Supplemental Social Security Income ("SSI") under XVI of the Social Security Act (Act). 42 U.S.C. §§ 1381-1383(f). The parties' have filed cross-motions for summary judgment. I find the ALJ's decision is supported by substantial evidence, and therefore, I recommend that Patterson's motion for summary judgment be DENIED, and the Commissioner's motion for summary judgment be GRANTED.

The ALJ properly found Patterson's testimony less than fully credible based on the lack of objective support for his claims and the inherent contradictions in his testimony, application, and medical records.  The ALJ was justified in discounting the report of Patterson's treating physician based on the limited amount of treatment and lack of supporting progress notes.  Thus, the ALJ's conclusion that Patterson had the residual capacity to perform low-stress, light work is supported by substantial evidence.  Although Patterson has offered some evidence in support of his claims, I credit the first-hand observations of the ALJ who carefully reviewed the record and weighed the conflicting evidence.

PROCEDURAL HISTORY

On November 4, 2002, Patterson filed an application for benefits alleging disability due to chronic pain caused by a gunshot wound in the right hip and leg, depression, and PTSD. Patterson's claim for benefits was denied and he filed a timely request for a hearing before an ALJ.  At the January 28, 2004 hearing, Patterson was represented by counsel and testified on his own behalf.[1]  Vocational expert ("VE") Carolyn Rutherford, M.Ed., also testified.

The ALJ found Patterson had severe right hip trauma, major depressive disorder, and PTSD which significantly impacted his ability to work.  (Finding No. 2).  Patterson's residual functional capacity permitted him to perform exertional work with lifting and carrying of 20 pounds, standing and walking for two hours and sitting for six hours.  (Finding No. 5). Patterson's mental impairments further limited his ability to work to one-to-two step tasks involving limited contact with the public.  Id.  Considering the testimony of the VE and Patterson's residual functional capacity, the ALJ concluded that Patterson could perform the

_____

[1] Patterson's fiancé, Rhonda Spells, was present for the hearing but did not testify.

work of an inspector/sorter, packer, and assembler.  (Finding No. 9).  Thus, the ALJ concluded
that Patterson was not under a disability as defined in the Act.  (Finding No. 10).

Patterson filed a timely request for review of the ALJ's decision.  The Appeals Council
denied Patterson's request for benefits on August 27, 2004.  Therefore, the ALJ's decision
became the final agency decision for judicial review.

<u>STATEMENT OF FACTS</u>

Patterson was 27 years old at the time of the 2004 administrative hearing.  He lives with
his fiancé, her five children, and their thirteen-month-old child, but he was no longer going to be
able to continue living with his fiancé because she lives in federally susidized Section Eight
housing.  Patterson has a teenage son who does not live with him.  Patterson has no past relevant
work experience.

At the hearing, Patterson painted a dire picture of chronic disabling pain precluding any
ability to work.  Patterson testified that he completed eighth grade and has never worked.  He
spends his day lying on the couch watching television, and only leaves the house if he has an
appointment.  Patterson uses a cane most of the time, and can only walk about two blocks before
his right leg gives out.  Cold weather and rain increase his pain.  Patterson is unable to do any
chores around the house.  He does not socialize, has difficulty concentrating, and has flashbacks
of his shooting.  Patterson is also unable to shower or bathe, needs help dressing, and has
difficulty taking public transportation.  He bangs his head and cuts and burns himself.

Patterson received welfare benefits and had a medical card for a year, but his benefits had
been terminated for a year and one-half prior to the hearing because he missed an appointment
with a case-worker.   Aleve is the only medication he takes since his health care benefits were

terminated.

This testimony is in many ways contradicted by Patterson's November 2002 application for disability.  Although Patterson testified that he finished the eighth grade, his application and medical records indicate that he had completed the tenth grade.  (Tr. 32, 73, 137).  He was able to shower and make his bed.  Patterson had no difficulty going out in public.  He was able to start and complete projects or activities such as reading a book or putting a puzzle together.  He was also able to plan his day to include activities such as household chores and scheduling appointments.  Patterson had no difficulty making decisions or understanding instructions and carrying them out.  He specifically noted that his pain did not effect his ability to think and concentrate.  He did not use a cane or any other assistive device to walk.  He last attended any physical therapy in August 1993.

Patterson's medical records are sparse.  He attributes the lack of medical records to his lack of medical coverage.  This may account for some gaps in treatment, however, there have been periods when he was covered and still failed to seek treatment.  His record is also replete with missed appointments and, as he testified, missing an appointment with the state welfare agency resulted in his loss of benefits.

1.  Physical impairments

Patterson was treated at Temple University Hospital for a gunshot wound in 1993.  His right thigh and hip were shattered and surgery was performed to insert rods to repair the damaged bones in his leg.  On March 17, 1997,  Patterson went to Temple University Hospital emergency room with complaints of swelling and pain associated with the gunshot wound.  An x-ray revealed no evidence of loosening of the rod and there was evidence of a healed fracture.

4

Patterson was discharged the same day with a prescription and a follow-up appointment with the surgical clinic.  There is no indication in the record that Patterson ever returned, as recommended.

Alan Lee, M.D., was Patterson's treating physician from September 2001 through May 2003.  (Tr. 122-36, 169-171).  Patterson first saw Dr. Lee on September 21, 2001 with complaints of right hip pain.  A medical history completed at this visit notes Patterson was able to shop, cook, and dress himself.  No complaints of depression were noted.  His next visit was in May 2002.  Patterson continued to complain of right hip pain and was referred for an orthopedic examination.  In October 2002 he was examined for an employability re-assessment.  Again, Patterson's complaint was limited to hip pain.  He was given a prescription for the anti-inflammatory drug Celebrex.  In November 2002 Patterson continued to complain of right hip pain and advised that Celebrex had provided little relief.  He was referred for an x-ray and his prescription was changed to the anti-inflammatory drug Bextra.  An October 28, 2002 x-ray performed at Frankford Hospital confirmed that Patterson's fracture was healed and the rod remained in place.

Patterson complained of depression for the first time on December 17, 2002, and Dr. Lee noted that Patterson was "being followed by Dr. Bien Amie."  (Tr. 122, 169).  His prescription was changed to a third anti-inflammatory drug, Naprosin, and Tylenol 3.  Patterson missed his next two appointments and was last examined by Dr. Lee on March 18, 2003.  He was referred to another orthopedist for a second opinion and his prescriptions were renewed.  There is no indication that Patterson obtained additional orthopedic treatment.  On May 13, 2003, he missed another appointment with Dr. Lee.

5

At the request of the state agency, Edward J. Resnick, M.D., conducted an orthopedic consultation on April 22, 2003.  (Tr. 144-45).  On examination, Dr. Resnick reported Patterson had a stiff right knee gait, limited range of motion of the right knee, and minimal limitation of motion of the right hip.  Dr. Resnick found no evidence of chronic or recurrent post-operative infection.  Patterson's wounds were solidly healed.  Patterson complained of severe pain, drainage, and dysfunction.  Dr. Resnick found no evidence of infection or that the bullet wound had recently been drained as Patterson claimed.  In response to Patterson's claim of ongoing pain, Dr. Resnick suggested that Patterson consider further treatment which might include exploratory surgery, but Patterson adamantly refused.

On May 22, 2003, state agency disability examiner R. Ricotta completed a Physical Residual Factional Capacity Assessment based on a review of the medical records.  (Tr. 106-13). Ricotta found Patterson able to lift up to 20 pounds occasionally and 10 pounds frequently. Ricotta found Patterson could sit, and stand and/or walk for about six hours in an eight-hour work day.  Patterson could also climb and balance frequently, and stoop, kneel, crouch, and crawl occasionally.  Patterson was not limited in his ability to push and pull or operate hand or foot controls.  Ricotta noted that Patterson's fracture was well-healed and there was no evidence of bone or soft tissue infection.   Thus, Ricotta concluded that Patterson's complaints were inconsistent with the medical evidence and only partially credible.[2]

---

[2] Also included in the record is a December 19, 2002 Medical Source Statement of Ability to do Work-Related Activities.  Unlike the other medical evidence, this assessment describe greater functional limitations.  It did not include any treatment notes.  Further, the physician's signature was illegible and the form contained no other identifying information.  Patterson did not recall who performed this evaluation or where it took place.  Counsel for Patterson suggested this test was conducted at Temple Orthopedics and advised the ALJ he would make additional efforts to verify the report.  The ALJ gave counsel an opportunity to investigate further, but in the absence of any additional verification, the ALJ properly determined that the form was not entitled to any weight.

6

2. <u>Mental Impairments</u>

Psychiatrist Michael Bien-Aime, M.D., evaluated Patterson on December 16, 2002.  Dr. Bien-Aime's initial evaluation, and a Medical Source Statement of Ability to do Work-Related Activities (Mental) form are the only records provided concerning this mental health treatment. (Tr. 155-56, 158-63).  Dr. Bien-Aime's evaluation consists of a recitation of Patterson's complaints and Dr. Bien-Aime's diagnosis of PTSD, depression, and stated intention to rule out chronic fatigue syndrome.  Patterson's Global Assessment of Functioning ("GAF") Scale score was 40.[3]  This report contains the first mention of Patterson's complaints of depression, flashbacks, and hearing gunshots.  Patterson reported prior suicide attempts and a loss of appetite.  He complained of constant, excruciating pain and expressed a wish that his leg be amputated.  Dr. Bien-Aime prescribed Effexor, an anti-depressant, weekly individual therapy, group therapy, and a follow-up visit in thirty days.  There is no record of Patterson's participation in any therapy or of any further visits to Dr. Bien-Aime.

Dr. Bien-Aime also completed an assessment of Patterson's functional abilities at his initial evaluation.[4]  (Tr. 155-56).  In the area of concentration, persistence, and pace, Patterson

---

[3] This score is a subjective determination of the physician's judgment based (on a 100 point scale) of Patterson's overall function on that particular day, excluding physical and environmental impairments.  A GAF score in the 31-40 range indicates some impairment in reality testing or communication or major impairment in several areas such as work or school, family relations, judgment, or mood.  Diagnostic and Statistical Manual of Mental Disorders IV-TR, ("DSM IV-TR") p. 34 (4th ed. 2000).  A physician's estimated GAF score of a claimant's overall level of functioning ability may assist the ALJ, but is not essential to resolution of the claim.  <u>Howard v. Commissioner</u>, 276 F.3d 235, 241 (6th Cir. 2002).

[4] This type of assessment is considered by the ALJ in determining whether the a claimant meets a Listed impairment.  The Listing of Impairments is a regulatory device used to streamline the decision-making process by identifying those claimants whose medical impairments are so severe that they would be found disabled regardless of their vocational background.  <u>Sullivan v. Zebley</u>, 493 U.S. 521, 532 (1990).  The Listing defines impairments that would prevent an adult, regardless of his age, education, or work experience, from performing "any" gainful activity, not just "substantial" gainful activity.  See 20 C.F.R. 404.1525a, 416.925a (2004) (purpose of the listings is to describe impairments "severe enough to prevent a person from doing any gainful activity").  The Listing was

was found to be extremely impaired in his ability to understand and carry out detailed instructions. Patterson was markedly impaired in his ability to remember appointments, complete tasks in a timely manner, maintain attention for extended periods, perform activities within a schedule, sustain an ordinary routine without special supervision, sustain tasks without an unreasonable number of breaks or rest periods, work with or near others without distraction, and perform at a constant pace. In the area of social interaction, Patterson was extremely impaired in his ability to respond appropriately to changes and stress. He was markedly impaired in his ability to interact appropriately with the public and avoid altercations. Patterson had a fair ability to perform in the remaining categories of social interaction. Dr. Bien-Aime reported five or more episodes of decompensation without further explanation.[5]

No additional treatment notes, testing results, or reports were provided to support Dr. Bien-Aime's conclusions. Nor is there any documentation to support Patterson's testimony that he continued in treatment. Patterson claims that Dr. Bien-Aime routinely refuses to provide progress notes, however, counsel agreed to make an additional effort to obtain the reports and provide them to the ALJ within thirty days. Counsel did not provide any notes or seek any further relief from the ALJ in this regard.

On March 20, 2003, Marvin Feigenberg, Ed.D., a licensed psychologist, conducted a consultative examination of Patterson at the request of the Commissioner. (Tr. 137-43). Dr. Feigenberg's report was based on his interview and observations of Patterson, informal testing, and information provided by Dr. Bien-Aime. Dr. Feigenberg's diagnosis was PTSD and

---

designed to operate as a presumption of disability making further inquiry unnecessary. Zebley, 493 U.S. at 532. To be found presumptively disabled, a claimant must satisfy the criteria under the Listing. Id. at 530.

[5] There is nothing in his report or any other medical evidence that would support such a finding.

depression.     Patterson advised Dr. Feigenberg that his pain medication did not provide relief.
Similarly, the medication prescribed for his emotional problems had not helped him.  Patterson
stated that he had undergone out-patient therapy for three months ending in February 2003.  He
also reported four suicide attempts with the most recent occurring one week earlier.[6]  Patterson
told of his inability to bathe by himself and his difficulty walking.  He reported that he takes
showers and his girlfriend helps him dress; rarely leaves the house, has no friends, has difficulty
sleeping, and tires easily.

Despite these complaints, Dr. Feigenberg's description of Patterson's mental status was
positive.  In his narrative report, Dr. Feigenberg found Patterson neat and clean, friendly and
cooperative, and able to maintain eye contact.  Patterson appeared to have average intelligence, a
satisfactory "fund of information," and good social judgment.  Patterson's thought processes
were clear and goal oriented.  All areas of memory were intact.  Although preoccupied with his
physical problems and pain, Patterson's mood or impulse control problems were affected by an
increase in pain.

Dr. Feigenberg's prognosis was that Patterson would not improve significantly in the
foreseeable future, but as described in this narrative report, this prognosis did not result in severe
limitations in ability to do work-related activities.  Dr. Feigenberg found Patterson able to follow
work rules, relate to co-workers, exercise sound judgment, interact well with supervisors,
maintain attention, and concentrate on the task at hand.  He found that Patterson understands,
remembers, is able to carry out complex job instructions, is able to maintain a good personal
appearance, behave in an emotionally stable manner, relate predictably in social situations, and

---

[6] There is no record of any hospitalizations resulting from a suicide attempt or for any other reason.

9

demonstrate reliability.

Yet, when completing the check-off form designed to provide an assessment of Patterson's ability to do work-related activities, Feigenberg contradicted the conclusions of his narrative report. (Tr. 141-43). For example, Feigenberg rated Patterson's ability to deal with the public and work stresses, and his ability to function independently as "poor/none." Feigenberg found Patterson had only a "fair" ability to follow work rules, relate to co-workers, use judgment, interact with supervisors, maintain attention/concentration, understand, remember and carry out simple instructions, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. Dr. Feigenberg did not provide any explanation for this disparity.

On May 21, 2003, at the request of the Commissioner, J.J. Kowalski, M.D., reviewed the reports of Dr. Bien-Amie and Dr. Feigenberg and completed a residual functional capacity assessment of Patterson's mental impairments and a Psychiatric Review Technique Form. (Tr. 88-105). Dr. Kowalski considered Patterson's PTSD and depression under Listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders). Dr. Kowalski's residual functional capacity assessment was consistent with Dr. Feigenberg's narrative report.[7] He found only moderate limitations in Patterson's abilities to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within customary tolerances, and respond appropriately to changes in the work setting. Dr. Kowalski found Patterson capable of performing adequate activities of daily living and self care, and able to get along with people and communicate clearly. Dr. Kowalski also found that Patterson's allegations were only partially

---

[7] Dr. Kowalski's findings were, however, inconsistent with Dr. Feigenberg's check-off assessment form.

credible.  He recognized that Patterson's self-preoccupation could affect his concentration, but he determined that Patterson was able to get along with others, follow instructions, and could perform routine, non-complex tasks.  Thus, Patterson did not meet the requirements for either Listing because his impairments did not significantly limit his functioning.

DISCUSSION

I must determine whether substantial evidence supports the Commissioner's final decision.  42 U.S.C. § 405(g); Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  The factual findings of the Commissioner must be accepted as conclusive, provided that they are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 390 (1971) (citing 42 U.S.C. § 405(g)); Rutherford, 399 F.3d at 552.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson, 402 U.S. at 401 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Reefer v. Barnhart, 326 F.3d 376, 379 (3d Cir. 2003). It is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence."  Rutherford, 399 F.3d at 552.

In determining whether substantial evidence exists, I may not weigh the evidence or substitute my own conclusions for those of the ALJ.  Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).  If the ALJ's findings of fact are supported by substantial evidence, I am bound by those findings, even if I would have decided the factual inquiry differently.  Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001).  At the same time, however, I must remain mindful that "leniency [should] be shown in establishing claimant's disability."  Reefer, 326 F.3d at 379 (quoting Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979)).

11

The Social Security Administration has adopted a system of sequential analysis for the evaluation of disability claims.  This five-step evaluation is codified at 20 C.F.R. §§ 404.1520, 416.920.[8]  A claimant is disabled if he is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  20 C.F.R. §§ 404.1520, 416.905.  The claimant satisfies his burden by showing an inability to return to his past relevant work.  Rutherford, 399 F.3d at 551.  Once this showing is made, the burden of proof shifts to the Commissioner to show that the claimant, given his age, education, and work experience, has the ability to perform specific jobs that exist in the economy.  20 C.F.R. §§ 404.1520, 416.920; Rutherford, 399 F.3d at 551.

Patterson claims the ALJ erred by failing to conduct an inquiry into the types and levels of job stresses involved and failing to include that limitation in her hypothetical question to the

---

[8]  These steps are summarized as follows:

1.  If the claimant is working or doing substantial gainful activity, a finding of not disabled is directed.  If not, proceed to Step 2.  20 C.F.R. §§ 404.1520(b), 416.920(b).

2.  If the claimant is found not to have a severe impairment which significantly limits his or her physical or mental ability to do basic work activity, a finding of not disabled is directed.  If there is a severe impairment, proceed to Step 3.  20 C.F.R. §§ 404.1520(c), 416.920(c).

3.  If the impairment meets or equals criteria for a listed impairment or impairments in Appendix 1 of Subpart P of Part 404 of 20 C.F.R., a finding of disabled is directed.  If not, proceed to Step 4.  20 C.F.R. §§ 404.1520(d), 416.920(d).

4.  If the claimant retains residual functional capacity to perform past relevant work, a finding of not disabled is directed.  If it is determined that the claimant cannot do the kind of work he or she performed in the past, proceed to Step 5.  20 C.F.R. §§ 404.1520(e), 416.920(e).

5.  The Commissioner will then consider the claimant's residual functional capacity, age, education, and past work experience in conjunction with the criteria listed in Appendix 2 to determine if the claimant is or is not disabled.  20 C.F.R. §§ 404.1520(f), 416.920(f).

See also Knepp v. Apfel, 204 F.3d 78, 83-84 (3d Cir. 2000) (citing Santise v. Schweiker, 676 F.2d 925, 926-27 (3d Cir. 1982)).

VE in accordance with Social Security Ruling ("SSR") 85-15.  I disagree.  SSR 85-15 requires an individualized inquiry of the VE as to job attributes that might produce disabling stress in a claimant and a determination whether jobs exist that do not have those attributes.  For the following reasons, I find that Patterson's job stress claim, to the extent that it was supported by the evidence, was properly considered by the ALJ and no further inquiry was required.

The hypothetical question posed to the VE must accurately portray the claimant's individual physical and mental impairments.  Rutherford, 399 F.3d at 553-54 (citing Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984)).  The question "must reflect all of a claimant's impairments that are supported by the record."  Id. (citing Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987)).  While the ALJ may proffer a variety of assumptions to the VE, the expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments.  Id.  Thus, the VE must have evaluated claimant's particular impairments as contained in the record.

The ALJ posed the following hypothetical question:

> [A]ssume that we are talking about an individual this claimant's age, education and past work history.  Further assume the individual is capable of lifting to 20 pounds in a job that involves sitting up to six hours, standing and walking two hours and work that is confined to simple, repetitive, one-to-two step tasks that provides no more than limited contact with the public.  Are there jobs that can be performed with these limitations?

(Tr. 43-44).  The VE responded that such a person could perform unskilled work within a range of light work, such as an inspector/sorter, packer, or assembler.  This person would also be able to perform the full range sedentary work.

13

Patterson contends that this hypothetical does not accurately describe his limitations because the ALJ improperly discounted the findings of Dr. Bien-Aime and Dr. Feigenberg.  Thus, Patterson's real challenge is that the ALJ's residual functional capacity assessment did not include all of the limitations suggested by Dr. Bien-Aime and Dr. Feigenberg.  Patterson also contends that the ALJ was required to contact Dr. Bien-Aime and Dr. Feigenberg to obtain a clarification of their assessments.  Patterson asserts that by discounting the opinions of Dr. Bien-Aime and Dr. Feigenberg, the ALJ effectively acted as her own medical expert.

The ALJ may not make speculative inferences from medical evidence, see e.g., Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981), but may reject conflicting medical evidence. Williams v. Sullivan, 970 F.2d 1178, 1187 (3d Cir. 1992).  When a conflict in the evidence exists, the ALJ may choose whom to credit, but "cannot reject evidence for no reason or for the wrong reason."  Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993); accord Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000).  The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects.  Stewart v. Secretary of H.E.W., 714 F.2d 287, 290 (3d. Cir. 1983).

The regulations also provide that a treating physician's opinion is entitled to controlling weight when it is supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record.  20 C.F.R. § 416.927(d)(2); Rutherford, 399 F.3d at 554 (citing Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993)). Although the treating physician's conclusion should be accorded great weight, it may be rejected if it is unsupported by sufficient clinical data, Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985), or contradicted by other medical evidence.  Plummer, 186 F.3d at 429.  "While the ALJ is,

of course, not bound to accept physicians' conclusions, she may not reject them unless she first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected." Kent v. Schweiker, 710 F.2d 110, 115 n.4 (3d Cir. 1983). A medical report not based on a personal examination by the physician is accorded less weight. Nelson v. Heckler, 712 F.2d 346, 348 (8th Cir. 1983). Thus, the ALJ may choose to reject a treating physician's assessment if it conflicts with other medical evidence, the ALJ clearly explains her reasons for rejecting the assessment, and she makes a clear record of her decision. See generally Rivera v. Barnhart, 2005 WL 713347 at *5 (E.D. Pa. March 24, 2005) (Giles, C.J.) (collecting authorities); see generally Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991). The ALJ must also seriously consider subjective complaints of pain, which may support a claim for benefits, especially when the complaints are supported by medical evidence. Smith, 637 F.2d at 972; Taylor v. Harris, 667 F.2d 412 (3d Cir. 1981); see also Mason, 994 F.2d at 1067.

Since Dr. Bien-Aime and Dr. Feigenberg based their findings, in large part, on Patterson's subjective complaints of pain, I must first assess whether the ALJ's rejection of Patterson's complaints was supported by substantial evidence. The ALJ reasonably discounted Patterson's subjective complaints because they were not supported by the medical evidence. Although Patterson had suffered a significant injury ten years earlier, x-rays indicated that his injuries had healed and there was no objective cause for the degree of pain alleged. Cf. Chrupcala, 829 F.2d at 1276 n.10 (claimant's testimony regarding his subjective complaints is entitled to great weight to the extent that it is supported by competent medical evidence); Dobrowolsky, 606 F.2d at 409. There is no evidence of any intervening occurrence that would have aggravated his 1993 injury and caused increased and disabling pain. As evidenced by the lack of medical records, Patterson

15

had sought minimal treatment in the ten years following his injury.  Patterson asserts that his lack

of treatment was due to a lack of insurance.  However, Dr. Lee's progress notes indicating

Patterson did not seek follow-up treatment and frequently missed appointments undermine this

claim.  (Tr. 122, 124-25, 169-71).  Moreover, it was only after Patterson applied for disability

benefits that he sought mental health treatment.  (Tr. 57, 115).

      A comparison of Patterson's hearing testimony with his application and his complaints to

his primary physician, Dr. Lee, provides additional support for finding Patterson less than fully

credible.  Patterson's activities of daily living were more limited as described at the hearing than

anywhere else in the record.  The most obvious example was Patterson's use of a cane at the

hearing.  There is no indication that a cane had been ordered by any physician, or that Patterson

had ever used a cane prior to the hearing.  Patterson said his pain was so severe that it required

him to visit a doctor every two weeks, yet there is no evidence confirming these frequent visits.

On the contrary, the records reveal sporadic treatment and multiple missed appointments with Dr.

Lee.

      Next, Patterson claims that the ALJ did not properly credit the reports of his treating

physician Dr. Bien-Amie, and consultative examiner Dr. Feigenberg.  The ALJ gave little weight

to Dr. Bien-Aime's report because no treatment notes were provided and because his assessment

was contradicted by other evidence.  After carefully reviewing the medical evidence, I find that

the ALJ reasonably determined that Dr. Bien-Aime's most restrictive limitations were not entitled

to controlling weight for several reasons.  Dr. Bien-Aime's diagnosis was based on Patterson's

subjective complaints and Patterson's description of continuing physical problems resulting from

his gunshot wound.  There is no record of any actual treatment or therapy.  At most, based on

Patterson's testimony, he had been under Dr. Bien-Aime's care for about three months.  Thus, Dr. Bien-Aime's opinion did not merit great weight as it did not "reflect expert judgment over a prolonged period of time."  Plummer, 186 F.3d at 429 (quoting Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987)); 20 C.F.R. § 416.927(d)(2)(i) (length and frequency of treatment will be considered in determining the weight of a treating physician's opinion).

The timing of Patterson's mental health treatment is also significant.  Patterson's first contact with Dr. Bien-Aime was after he had filed for disability.  Thus, a fair inference is that Patterson saw Dr. Bien-Aime, at least in part, to obtain medical support for his disability application.  It is also significant that there is no mention of depression or flashbacks in the records that predate Patterson's application for benefits.  All of this justifies the ALJ's adverse credibility finding and supports the ALJ's limited consideration of Dr. Bien-Aime's findings.

The ALJ also provided adequate reasons for not relying on Dr. Feigenberg's consultative examination report.  First, Dr. Feigenberg is not a treating physician so his opinion is not entitled to greater weight than any other consultant.  Second, Dr. Feigenberg's summary finding that Patterson could not function independently is not justified by the limitations noted in his narrative report.  Dr. Feigenberg concluded that any improvement in Patterson's mental condition was totally dependent on improvement of his physical condition.  This conclusion was based on Dr. Feigenberg's wholesale adoption of Patterson's subjective complaints of constant and severe pain. Patterson's complaints are not supported by the medical evidence, and therefore, cannot provide an adequate basis for Dr. Feigenberg's assessment.

Thus, the ALJ properly credited Dr. Kowalski's findings that Patterson's depression and PTSD did not significantly limit his functioning, and no further evaluation of Patterson's alleged

17

stress and mental illness was required.  See Burns v. Barnhart, 312 F.3d 113, 130 (3d Cir. 2002)

(absent medical evidence, a claimant's mention of stress to a medical source does not require SSR

85-15 inquiry.)  The ALJ's hypothetical question contained all of Patterson's limitations that were

supported by the record and it was proper for her to rely on the VE's response as evidence that

Patterson could perform a variety of jobs that exist in the national economy.[9]

     Patterson also claims the ALJ was required to obtain the testimony of a medical expert to

evaluate the combination of his physical and mental impairments.  This claim is without merit.

An ALJ has discretion to obtain medical expert testimony if there is inadequate medical evidence

in the record to make a disability determination.  20 C.F.R. §416.927(2)(iii).  There is no

requirement that the ALJ have a medical expert present at the hearing, nor was one required in

this case.

     Patterson contends that an updated medical opinion is needed where the medical evidence

---

[9] There was also no need to further contact either physician to clarify his report.  Counsel was provided ample time to obtain the supporting treatment notes or obtain other evaluations to sustain his burden of proof of disability.  20 C.F.R. § 416.1540(b)(1),(2).  There is no indication that counsel contacted the ALJ to report further difficulty obtaining the reports or for assistance in complying with obligation.  For example, counsel did not ask the ALJ to subpoena Dr. Bien-Aime's records or seek additional time to obtain further evaluation of Patterson's mental impairments.  Further, the ALJ is required to contact a treating source for clarification only "if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record."  SSR 95-5p.  Here, the ALJ was able to determine the basis of the opinions offered by both physicians, but found each opinion was not supported by the evidence for the reasons discussed.

     Patterson cites two cases from other jurisdictions to support his assertion that the ALJ was required to contact Dr. Bien-Aime.  His reliance on these cases is misplaced.  In Barnett v. Barnhart, 381 F.3d 664 (7th Cir. 2004) there was a significant medical history predating Barnett's claim that was not considered by the ALJ and supported the treating physician's findings.  Further, the ALJ did not use a medical expert to determine if Barnhart met a Listing.  Under these circumstances, the court determined that the ALJ erred in rejecting the treating physician's opinion without further clarification.  In Robinson v. Barnhart, 366 F.3d 1078 (10th Cir. 2004), the court held the ALJ could not reject a treating physician's opinion based on the ALJ's speculative lay opinion that the claimant refused to comply with prescribed treatment when there was no evidence that the treating physician suggested a failure to comply.  Here, the ALJ relied on Dr. Kowalski's expert opinion in rejecting Dr. Bien-Aime's findings and in determining that Patterson did not meet a Listing.  The medical evidence, and lack thereof, further supports this conclusion.

suggests that a finding of medical equivalence to a Listing may be reasonable.  No such evidence is present here.  As set forth above, the record was fully developed and contained sufficient evidence for the ALJ to consider whether Patterson's impairments equaled a Listing.  The ALJ properly discounted the medical reports to the extent that they found Patterson's impairments totally disabling.

Substantial evidence supports the ALJ's decision.  Accordingly, I make the following:

## R E C O M M E N D A T I O N

AND NOW, this          day of July, 2005, IT IS RESPECTFULLY RECOMMENDED that Patterson's motion for summary judgment be DENIED, and the Commissioner's motion for summary judgment be GRANTED.

BY THE COURT:

_____
TIMOTHY R. RICE
U. S. MAGISTRATE JUDGE